FILED

06 SEP 25 PM 2:56

DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LINCOLN CLUB OF SAN DIEGO COUNTY,<br><br>  Plaintiff,<br><br>vs.<br><br>THE CITY OF SAN DIEGO, a California charter city; DOES 1 through 10,<br><br>  Defendants. | CASE NO. 05cv1609-LAB (JMA)<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND ORDER REQUIRING PARTIES TO SUBMIT BRIEFS**<br><br>[Docket Nos. 33-1, 33-2 and 46-1] |

Plaintiff The Lincoln Club of San Diego County's ("Lincoln Club") brought this civil rights action under 42 U.S.C. § 1983 for damages, declaratory, and injunctive relief. Plaintiff contends the Election Campaign Control Ordinance ("ECCO"), violates its First Amendment rights of speech and association. Specifically, two sections of ECCO, San Diego Municipal Code §§ 27.2936 and 27.2950 (the "Ordinance"), limit the amount of member dues and contributions Plaintiff may use for independent expenditures[1] in support and opposition to candidates in city elections. In the past, Plaintiff has made contributions to candidates, and wishes to do so in the future without being subject to the limitation. Plaintiff previously sought preliminary injunctive relief which would have allowed

---

[1] Independent expenditures are defined in California Government Code Section 82031 as "an expenditure made by any person in connection with a communication which expressly advocates the election or defeat of a clearly identified candidate or the qualification, passage or defeat of a clearly identified measure, or taken as a whole and in context, unambiguously urges a particular result in an election but which is not made to or at the behest of the affected candidate or committee." *See also* Cal. Gov't Code § 85500. The Municipal Code definition of the term is consistent. San Diego Municipal Code § 27.2903.

it to make substantial independent expenditures in San Diego's November 8, 2005 mayoral election, but because of the Ordinance it could not spend as much as it sought to spend.

Following the Court's denial of Plaintiff's motion for preliminary injunctive relief, the parties brought cross motions for summary judgment. Plaintiff alternatively moved for partial summary judgment.

## I. LEGAL BACKGROUND

### A. Law of the Case

This Court denied Plaintiff's motion for preliminary injunctive relief in this case. *See* Order of October 6, 2005. In so doing, the Court ruled on a number of legal issues, although it did not consider all the arguments made in support of the parties' cross motions for summary judgment. "Under the law of the case doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation marks omitted). The law of the case doctrine is discretionary, and it does not apply "to circumstances where a district court seeks to reconsider an order over which it has not been divested of jurisdiction." *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (*per curiam*), *cert. denied*, 544 U.S. 956 (2005).

### B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). In ruling on the motion, the Court does not weigh the evidence or determine the truth of Plaintiff's allegations, but instead determines whether there is a genuine issue of fact for trial. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

1  256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive
2  law. *Id.* at 248. After the moving party has met his or her burden, the burden then shifts to the non-
3  moving party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324.

Even where a plaintiff is represented by counsel, as here, the Court construes civil rights claims liberally. *Holley v. Crank*, 400 F.3d 667, 674 (9th Cir. 2005). The Court will not assume, however, that Plaintiff can prove facts that it has not alleged or that Defendant has violated its rights in ways that have not been alleged. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## II. FACTUAL BACKGROUND

A body of undisputed facts guides the Court's analysis. *See generally* Joint Statement of Undisputed Facts, April 7, 2006 ("Joint Statement"). Lincoln Club is an Internal Revenue Code section 527 tax-exempt political organization based in San Diego County. (*Id.* at 2.) It was organized in 1983 for the purposes of, among other things, participating in electoral politics in the city and county of San Diego. (*Id.*) Since its inception, it has had a consistent practice of making independent expenditures in connection with San Diego city elections. Plaintiff Lincoln Club has 360 members, of which approximately 140 are organizations and approximately 220 are individuals. (*Id.*)

Plaintiff Lincoln Club has been identified by the Republican Party of San Diego County as a Republican club. (Joint Statement at 3.) In furtherance of its stated purpose of participating in partisan politics, Lincoln Club "controls one or more general purpose recipient committees[2] registered with the California Secretary of State for the purpose of making contributions to state candidates," controls a federal political action committee, and formerly controlled an independent expenditure committee used to make independent expenditures in connection with city elections. (Compl. ¶ 25.)

Since its inception in 1983, Plaintiff has made independent expenditures during elections such as sending out mailers and putting up billboards. Lincoln Club PAC makes contributions to federal

---

[2] A general purpose recipient committee is "any person that receives contributions totaling $1,000 or more during a calendar year to support or oppose more than one candidate or measure. This type of committee is not controlled by a candidate." San Diego Mun. Code § 27.2903. Plaintiff indicates that the ECCO's definition of "general purpose recipient committee" refers to independent expenditure committees such as Lincoln Club. (Pl.'s Memo of P. & A. in Supp. of Mot. for Summ. J. at 7) (citing San Diego Mun. Code § 27.2903).

candidates, although this practice is not at issue in this case. In the years 1998, 2000, 2002, and 2004, the Lincoln Club PAC made 100% of its federal-candidate contributions to Republican federal candidates and 0% of its federal-candidate contributions to Democratic federal candidates. (Joint Statement at 3.) In 2005, Lincoln Club made expenditures ranging from approximately $17,000 to approximately $45,000 per candidate in support of Republican candidates for San Diego city offices, and in opposition to one Democratic candidate. (*Id.*)

Section 27.2936 was added by ordinance on September 7, 2004, and became effective on January 5, 2005. ( Joint Statement at 3.) The ordinance of which it is a part was originally adopted in 1973. (*Id.*) The voluminous legislative record contains no studies, reports, or other evidence demonstrating that entities making exclusively independent expenditures in connection with San Diego city elections pose a danger of actual or apparent corruption in receiving contributions, or in making independent expenditures, in relation to San Diego city elections. (*Id.*)

It is undisputed the Ordinance "prohibits committees from using funds in excess of the $250 per donor per election contribution limit for City Council races, and the $300 per donor per election contribution limit for Mayoral races, in connection with independent expenditures made by the committees in support of Council or Mayoral candidates." (Answer ¶ 5.) Section 27.2936 provides in pertinent part:

> Contribution Limitations for General Purpose Recipient Committees
>
> (a) General purpose recipient committees may participate in City candidate elections by using contributions from individuals, subject to the contribution limits established by this section.
>
> (b) It is unlawful for any general purpose recipient committee to use a contribution for the purpose of supporting or opposing a candidate seeking City Council district office unless the contribution is attributable to an individual in an amount that does not exceed $250 per candidate per election.
>
> (c) It is unlawful for any general purpose recipient committee to use a contribution for the purpose of supporting or opposing a candidate seeking the office of Mayor or City Attorney unless the contribution is attributable to an individual in an amount that does not exceed $300 per candidate per election.
>
> . . .

/ / /

/ / /

> (f) This section shall not be construed to limit the amount of money that an individual or any other person may give to a general purpose recipient committee in the form of contributions, dues, donations, fees, or other forms of monetary transactions, but shall be construed to limit the source and amount of contributions a general purpose recipient committee may use to participate in City candidate elections.
>
> . . .

San Diego Mun. Code § 27.2936.

It is undisputed "these same Municipal Code provisions . . . prohibit the making of any independent expenditures that are paid for with funds received from donors who are not 'individuals.'" (Compl. ¶ 31; Answer ¶ 16.) The broad definition of "person" under Municipal Code Section 27.2903 makes it clear a business, "organization or a group of persons acting in concert" is not an individual. San Diego Mun. Code § 27.2903, *see also* § 27.2950(g) (Compl. ¶ 31; Answer ¶ 16.)

It is further undisputed Lincoln Club "may only make independent expenditures in relation to City elections to the extent such expenditures can be paid for with funds that do not exceed the $250/$300 per-donor per election limits set forth in [the Ordinance], and is prohibited from paying any such independent expenditures with funds received from non-individual contributors. (Compl. ¶ 32 (emphasis omitted); Answer ¶ 16.)

It is also undisputed that "[i]n or around 2004 and/or 2005, the Lincoln Club was advised by the City of San Diego that the provisions of the [Ordinance] cited above prohibit the Lincoln Club from making any independent expenditures with funds received in excess of $250 per member in City Council elections, and in excess of $300 per member in City Mayor and City Attorney elections." (Compl. ¶ 38; Answer ¶ 16.) Violations of the Ordinance are punishable as misdemeanors. San Diego Mun. Code § 27.2991. (Compl. ¶¶ 19, 33; Answer ¶ 33.)

## III. DISCUSSION

At the outset, the Court notes that contributions to candidates and political causes, and expenditures in furtherance of political campaigns implicate First Amendment rights, *Federal Election Comm'n v. National Conservative Political Action Committee*, 470 U.S. 480, 493 (1985) ("*NCPAC*") ("There can be no doubt that the expenditures at issue in this case produce speech at the core of the First Amendment."), in particular the freedom of speech and association provisions of the First Amendment. *McConnell v. FEC*, 540 U.S. 93, 207 (2003).

### A. Jurisdiction

As a preliminary matter, the Court must determine whether it has jurisdiction to address the injunctive relief question at this time. *In re Thomas*, 428 F.3d 1266, 1268 (9th Cir. 2005) (holding that court must consider the presence or absence of subject matter jurisdiction *sua sponte*). The election in connection with which Plaintiff specifically sought to make increased expenditures has passed. Ordinarily this would render the issue moot as to the previous election, and unripe as to future elections, and this Court would therefore lack jurisdiction to address this question. *Gates v. Deukmejian*, 987 F.2d 1392, 1410 (9th Cir. 1992) (federal courts lack jurisdiction to rule on their merits of moot or unripe questions).

Uncontested facts, however, make clear that the situation for which Plaintiff seeks injunctive relief is likely to recur in future elections. It is likewise apparent that the issues underlying Plaintiff's request for injunctive relief do not ripen until elections approach. This Court previously denied Plaintiff's request for preliminary injunctive relief, in part based on equitable considerations arising because the relief was requested on the eve of an election. *See* Order of October 6, 2005 at 7–8. Therefore, the Court determines that the narrow exception to the mootness doctrine applies, and the Court retains jurisdiction to address the question of injunctive relief. *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985) (explaining that the narrow exception to the mootness doctrine would apply if plaintiff demonstrated "a reasonable expectation that they will once again be subjected to the challenged activity"). *See also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978) (applying exception to mootness doctrine to reach the question of Constitutionality of a statute limiting contributions or expenditures to influence the outcome of referenda).

### B. Requests for Judicial Notice

Plaintiff requests that the Court take judicial notice of eight documents. (Plaintiff's Request for Judicial Notice filed January 31, 2006, at 2.) Exhibits A–F are copies of sections of the City of San Diego's Ordinance. Exhibit G is a copy of this Court's order denying Plaintiff's motion for preliminary injunction in this case. Exhibit H is a copy of the district court's decision on a motion for preliminary injunction in the case of *San Franciscans for Sensible Government v. Renne* (C-99-02456) (N.D. Cal. 1999). The request was unopposed.

The standards governing judicial notice are set forth in Fed. R. Evid. 201. The Court finds Exhibits A–F meet these requirements and therefore takes judicial notice of these exhibits. Exhibit G is already part of the record in this case, and under the law of the case doctrine, discussed previously, the Court must consider it. Therefore, this request is granted. Exhibit H is an unpublished order from another court in an unrelated case. While Ninth Circuit Rule 36-3 permits the Court to rely on unpublished opinions for certain purposes, it is apparent that this order is not being cited for any of these. Rather it appears that Plaintiff intends this order to serve as persuasive precedent.[3] Because it would violate Ninth Circuit rules for this Court to rely on this unpublished order, this request is denied.

**C. Constitutionality of § 27.2936**

The Court's analysis is informed by the Ninth Circuit's opinion in *Lincoln Club of Orange County v. City of Irvine, CA*, 292 F.3d 934, 936 (9th Cir. 2002). The Ninth Circuit examined a similar, but not identical, ordinance that prevented an organization from, in the same two-year election cycle, accepting contributions exceeding $320 and making independent expenditures in support of or in opposition to candidates for office in municipal elections. The Ninth Circuit considered membership dues to be contributions and held that less than strict scrutiny was warranted. *Id.* at 938. As discussed below, this Court holds that the same level of scrutiny applies to the limits at issue here.

It is evident the parties dispute whether the Ordinance limits contributions or expenditures. The Court, citing *McConnell*, 540 U.S. at 138–39, 152 n.48, ruled on this issue in its Order of October 6, 2005. The Court held that the Ordinance does not function as a limit on expenditures, but on contributions. Order at 13. The Court reasoned that the Ordinance functions to implement a contribution limit, or to prevent the circumvention of the limit. *See McConnell*, 540 U.S. at 138–39 ("The relevant inquiry is whether the mechanism adopted to implement the contribution limit, or to prevent the circumvention of the limit, burdens speech in a way that a direct restriction on the contribution itself would not.") The Court also noted that although the contribution limits indirectly

---

[3] Plaintiff cites and quotes this order (Memo of P. & A. in Supp. of Mot. for Summ. J. at 14–15) in support of its contention that limitations on contributions to entities that make solely independent expenditures are unconstitutional. In accord with Ninth Circuit rule 36-3, the Court will not consider or rely on this argument or citation.

1  limit the amount of Plaintiff's expenditures, that in itself does not turn contribution limits into
2  expenditure limits. *Id.* at 139, 152 n.48.
3        As distinct from the ordinance at issue in *Lincoln Club of Orange County*, 292 F.3d at 936, the
4  Ordinance here places no limits on Plaintiff's receipt of contributions, or on its independent
5  expenditures. If Plaintiff wishes to increase its total independent expenditures on one city election,
6  however, it must increase the number of contributors, rather than increasing the size of members'
7  contributions beyond the Ordinance's limits. The ordinance at issue in *Lincoln Club of Orange
8  County*, by contrast, flatly prohibited all expenditures by the club if it accepted contributions in excess
9  of fixed dollar limits.[4]
10       In ruling on the motion for preliminary injunction in this case, the Court therefore approached
11 the Ordinance under the more lenient standard of review applicable to contribution limits rather than
12 the strict scrutiny standard applicable to spending limits. Order of October 6, 2005, at 13 (citing
13 *McConnell*, 540 U.S. at 138.) The lesser standard of review applies even though Plaintiffs' members'
14 contributions are used for independent (i.e., noncoordinated) expenditures. *See McConnell*, 540 U.S.
15 at 152, n.48 (citing *Cal. Medical Ass'n. v. Federal Election Comm'n*, 453 U.S. 182 (1981) ("*CMA*")).
16 The pertinent standard of review is therefore the "closely drawn" standard identified in *Buckley v.
17 Valeo*, 424 U.S. 1, 25 (1976). A statute is closely drawn when the means chosen do not "burden
18 substantially more speech than is necessary to further the government's legitimate interests." *Cal.
19 Prolife Council Political Action Committee v. Scully*, 989 F. Supp. 1282, 1296 (E.D.Cal., 1998)
20 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). While this standard requires that
21 the Ordinance be "closely drawn" to match a "sufficiently important interest," it does not require that

---

[4] Plaintiff cites *Lincoln Club of Orange County*, 292 F.3d 938–39, for the principle that an ordinance limiting an entity's ability to make independent expenditures based on the size of its membership is subject to strict scrutiny. (Pl.'s Memo of P. & A. in Supp. of Mot. for Summ. J. at 21–22.) In fact, because of the ordinance at issue there, *Lincoln Club of Orange County* pointed out merely that the ordinance at issue there required an organization to choose between accepting dues greater than $160 annually and making independent expenditures. The court pointed out that if the organization there wished to qualify to make any independent expenditures, it would have to change its organizational structure by reducing its dues. In turn, the organization would have to increase its membership dramatically "to maintain the same <u>funding level that it currently enjoys</u>." 292 F.3d at 939 (emphasis added). Plaintiffs would have the Court read this as if it said "the same <u>level of expenditures that it currently makes</u>." This passage appears, however, to refer to the organization's <u>own</u> funding, not its level of expenditures. In other words, only organizations charging low dues (*i.e.*, low levels of per-member funding) were permitted to make any independent expenditures.

the dollar amount of the limit be "fine-tuned."' *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 387–88 (2000) ("*Shrink*") (citing *Buckley*, 424 U.S. at 25, 30).

The Supreme Court has recently explained that a part of the calculus of applying the "closely drawn" standard can include determining whether contribution limits are too low. *Randall v. Sorrell*, 126 S.Ct. 2479, 2482 (2006). Contribution limits can be unconstitutionally low if they prevent candidates from "amassing the resources necessary for effective campaign advocacy, . . . [or] magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage . . . ." *Id.* at 2492 (citing *Buckley*, 424 U.S. at 21) (internal quotation marks omitted). Plaintiff does not, however, suggest that the limits at issue here are unconstitutionally low. Furthermore, the limits at issue here are comparable to limits imposed by a number of states and cited as benchmarks in *Randall*. *Randall*, 126 S.C.t at 2493–94.

Important interests can include "[p]reserving the integrity of the electoral process, preventing corruption, . . . sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government . . . [and p]reservation of the individual citizen's confidence in government . . . ." *Bellotti*, 435 U.S. at 788–89 (alterations, quotation marks, and citations omitted). The Supreme Court has "specifically affirmed the importance of preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption. These interests directly implicate the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process." *FEC v. Nat'l Right to Work Committee*, 459 U.S. 197, 208 (1982) (citing *Buckley*, 424 U.S. at 26–27; and quoting *United States v. United Automobile Workers*, 352 U.S. 567, 570 (1957)) (internal quotation marks omitted).

The Court must also, as a preliminary matter, determine whose speech is allegedly being regulated by the contribution limits. The Supreme Court has explained that when contributions are made to committees that in turn engage in independent expenditures, it is the recipient committee that transforms the funds into speech. *CMA*, 453 U.S. at 197. In other words, contribution limits do not infringe contributors' free speech rights. *Id.* The distinction is a relevant one. In *NCPAC*, 470 U.S. at 494–95, the Supreme Court distinguished *CMA*, which upheld limits on <u>contributions</u> to

organizations that made independent expenditures, from the case before it, where limits on independent <u>expenditures</u> by organizations were at stake. While noting that restrictions on contributions had been upheld in *CMA*, the Court in *NCPAC* struck down restrictions on independent expenditures. *Shrink*, decided later, held that *Buckley* provided authority for states to limit contributions.

The amount of evidence needed to justify a contribution limit will "vary up or down with the novelty and plausibility of the justification raised." *Shrink*, 528 U.S. at 391. The perceived threat not, however, be illusory, or "mere conjecture." *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003) (quoting *Buckley*, 424 U.S. at 27; *Shrink*, 528 U.S. at 392). In *Shrink*, the Court found evidence of the potential for corruption sufficient where the evidence consisted of a statement from a state senator, media reports of large contributions, and a 74% majority of voters who determined that contribution limits were necessary. 528 U.S. at 393. Similarly, in *Montana Right to Life Ass'n,* the Ninth Circuit relied on polls of Montana voters, and a scandal involving a state senator's letter to colleagues urging passage of a bill in part because its backers were large party contributors. 343 F.3d at 1092.

Here, the Ordinance is somewhat analogous to the limitation at issue in *CMA*. The Court in *CMA* observed that the political action committee at issue there, CALPAC, received funds from multiple contributors annually and made independent expenditures in support of multiple candidates. 453 U.S. at 196. The fact that CALPAC received funds from more than 50 contributors meant that it was more than the California Medical Association's mouthpiece, and in fact was in fact engaging in its own speech. *Id.* at 196–97. Obviously the California Medical Association generally agreed with that speech, but mere "sympathy of interests" did not convert CALPAC's speech into that of CMA. *Id.* at 196. The same holds true here; the speech at issue is Plaintiff's, not its members'.

The Ordinance is, in certain respects, more liberal in its structure than the one at issue in *CMA*. In *CMA*, a blanket limitation was imposed on contributions to a political action committee that in turn made independent expenditures. While the dollar limitation is lower in this case, the dues of Lincoln Club's members can be applied to multiple elections. In other words, contributions are not subject to a blanket limitation as were the contributions in *CMA*, but are limited to a particular dollar amount per

candidate supported. The significant difference is that *CMA* dealt with contributions to multicandidate committees, which were analogized to "conduits for contributions to candidates . . . ." 453 U.S. at 203 (Blackmun, J., concurring in part and concurring in the judgment).

The Ordinance, furthermore, is more liberal than the regulation the Ninth Circuit declined to strike down in *Lincoln Club of Orange County*. There, the Ninth Circuit refused to apply strict scrutiny to limitations on contributions to independent expenditure committees. 292 F.3d at 938. It was, rather, the complete bar on expenditures by such committees that the Ninth Circuit held warranted strict scrutiny. *Id.* at 938–39.

In *CMA*, Justice Blackmun, concurring in part and concurring in the judgment, agreed that contributions to a multicandidate political committee could be limited, but then went on to "stress . . . that a different result would follow if [limitations] were applied to contributions to a political committee established for the purpose of making independent expenditures, rather than contributions to candidates." 453 U.S. at 203. While this is obviously non-controlling dicta, it signals concerns with the kind of limits at issue here.

In its more recent decision in *McConnell*, however, the Supreme Court reasoned the statute at issue in *CMA* was justified, not simply because it prevented contributors from circumventing limits on contributions to candidates, but also because it limited contributions funding "express advocacy and numerous other noncoordinated expenditures." *McConnell*, 540 U.S. at 152, n.48. The opinion notes that *Buckley* and *CMA* necessarily relied on this interpretation of the statute. *Id.*

In earlier decisions, the Supreme Court indicated its belief that noncoordinated contributions (in contrast to contributions made directly to candidates or coordinated with them) were less likely to result in corruption or the appearance thereof. The contributions at issue here are, by definition, made for the purpose of funding independent expenditures, and are not made directly to candidates or coordinated with candidates. In the arena of expenditures, the Supreme Court opined that limits on independent expenditures are considered less directly related to prevention of corruption or an appearance of corruption than are restrictions on coordinated expenditures. *Buckley*, 424 U.S. at 47 ("The absence of prearrangement and coordination of an expenditure with the candidate . . . not only undermines the value of the expenditure to the candidate, but also alleviates the danger that

expenditures will be given as a quid pro quo for improper commitments from the candidate.") The Supreme Court also expressed its belief that expenditures made possible by large donations by organizations such as political parties were even less directly linked to individuals and therefore described them as less likely to result in corruption. *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604, 617 (1996) ("*Colorado I*") ("If anything, an independent expenditure made possible by a $20,000 donation, but controlled and directed by a party rather than the donor, would seem less likely to corrupt than the same (or a much larger) independent expenditure made directly by that donor.") Following this reasoning, the fact that members' contributions are first given to Lincoln Club and then used to fund independent expenditures renders the threat of corruption (or the appearance thereof) more attenuated than it would otherwise be.

In *McConnell*, however, the Supreme Court gave considerable weight to evidence of corruption through large indirect contributions; *McConnell* therefore signaled a shift in the Supreme Court's outlook with regard to the corruptive influence of indirect contributions and the "soft-money explosion of the 1990s." 540 U.S. at 145, n.45. The opinion in that case indicated the Supreme Court's willingness to define corruption — and particularly the appearance of corruption — broadly, in light of "precedent, common sense, and the realities of political fundraising exposed by the record in this litigation." 540 U.S. at 152; *see also id.* at 152 n.48 (interpreting *Shrink* and *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) ("*Colorado II*"), as supporting broad definitions of corruption). The opinion notes a pattern of large contributors seeking and expecting enhanced influence as a result of their generous, albeit indirect, contributions. *Id.* at 145–47.

The record in this case provides some evidence of activities similar to those that concerned the *McConnell* court. For example, *McConnell* notes with concern the habit of candidates directing potential donors to give money to local committees they did not control, knowing that they would nevertheless directly benefit from the donation as a result of a system of informal practices and understandings. 540 U.S. at 146. The opinion also noted that although candidates had no direct connection with fundraising, they were routinely made aware of the identities of those whose indirect donations were benefitting them. *Id.* at 147.

///

In this case, the parties agree that the Republican Party of San Diego County listed Plaintiff as a "Republican Club" on its website. (Joint Statement at 3.) The parties agree on other facts showing that the Lincoln Club, while perhaps not formally affiliated with the Republican Party, nevertheless maintains strong associations and offers the party's candidates most or all of its support. (*Id.*) While this evidence does not compel a finding that Plaintiff is a mouthpiece for the Republican party or is itself engaging in informally directing donations to particular candidates, it nevertheless demonstrates that the concerns *McConnell* voices regarding contributions being informally directed to particular candidates are of potential concern in San Diego.

On the other hand, the parties agree that the legislative record in this case "contains no studies, reports, or other evidence demonstrating that entities that make nothing but independent expenditures in connnection with [San Diego] City elections pose a danger of actual or apparent corruption in receiving contributions, or in making independent expenditures, in relation to [San Diego] City elections." (Joint Statement at 3.) The fact that the Ordinance was enacted by the San Diego City Council eliminates the possibility that public concern over the appearance of corruption could be demonstrated by poll numbers.

Plaintiff raised the issue of the deficient legislative record for the first time in its reply brief in support of its motion for preliminary injunction, to which Defendant had no opportunity to respond. (Order of October 6, 2005, at 11.) This argument was therefore not fully considered and disposed of at that time.

In general, the predictive judgments of legislative bodies embodied in statutes are entitled to deference. *Cal. Prolife Council*, 989 F.Supp. at 1299. California's own courts defer to the predictive judgments of its legislature on a sliding scale, with the greatest deference being given to economic judgment, but applying "greater judicial scrutiny . . . [w]hen an enactment intrudes upon a constitutional right." *Id.* (citing and quoting cases). The substantial deference federal courts accord to the predictive judgments of legislative bodies does not insulate statutes from judicial review altogether, of course. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 666 (1994) ("On the contrary, we have stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'")

(quoting *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)). Rather, federal courts' obligation to exercise independent judgment when First Amendment is intended to "assure that, in formulating its judgments, [the legislative body] has drawn reasonable inferences based on substantial evidence." *Id.* (citing *Century Communications Corp. v. FCC*, 835 F.2d 292, 304 (D.C.Cir. 1987) ("[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures."))

As these holdings make clear, it is the legislative body's determination made in the course of drawing inferences and formulating its judgments that federal courts will defer to. The evidence or argument that must serve as a basis for the relevant regulation's enactment, in other words, is the evidence or reasoning relied on by the legislative body that enacted it, not the *post hoc* arguments of its attorneys when the regulation is challenged. Here, this means that Defendant must point to evidence showing that the San Diego City Council relied on "empirical support or at least sound reasoning" in enacting its measures.

Although *McConnell* expressed deep concern about the potential for large contributions to buy influence and access, it did not hold that contributions necessarily resulted in corruption or the appearance thereof in all circumstances. *McConnell* both reaffirmed and applied the "closely drawn" standard for limits on contributions, which continues to incorporate the "sufficiently important interest" requirement. *McConnell*, 540 U.S. at 134–37 (discussing the standard with approval), 169 (applying the standard). A "sufficiently important interest" cannot be evidenced simply by showing that a challenged regulation limits contributions; if it could, the "sufficiently important" element would simply drop out of the analysis. Even after *McConnell*, a "sufficiently important interest" must be supported by the record. *See Randall*, 126 S.Ct. at 1299 (in evaluating the Constitutionality of Vermont's low contribution limits, observing that there was no evidence in the record that corruption was a more serious problem in Vermont than elsewhere).

In its motion for summary judgment, its opposition to Plaintiff's cross motion for summary judgment, and its reply, Defendant relies heavily on the reasoning of *McConnell* regarding the pattern of corruption, but points to no evidence or reasoning relied on by the City Council in enacting the Ordinance. While the evidence and argument that formed the basis for *McConnell*'s deference to

Congressional determinations of the need for limitations was obviously relevant there, there is no evidence at all that Defendant knew of or relied on the same evidence. While the Court's review of the Ordinance is more lenient than strict scrutiny, Defendant's decision to enact the Ordinance must be based on <u>some</u> "empirical support or at least sound reasoning." Even under *McConnell*'s more generous analysis, the Ordinance cannot have been enacted on the basis of illusory considerations or mere conjecture that corruption or the appearance of corruption was a danger.

The Ordinance itself identifies its purpose, in part as "to avoid the corruption or the appearance of corruption brought about when candidates for elective City office accept large campaign contributions." § 27.2901. While this identifies the City Council's stated purpose in amending the Ordinance, it does not give the basis for the City Council's decision, or identify its reasoning.

In its complaint, Plaintiff alleges irregularities that, if true, the City Council would likely have been aware of, namely that public employees' unions are permitted under the Ordinance to exact mandatory political action dues that fall below the Ordinance's limits and use them to support the candidacies of sympathetic City Council members. (Complaint ¶ 17.) On the basis of these allegations, it is therefore possible that the City Council enacted the Ordinance for reasons that will not withstand scrutiny. The Court must bear this possibility in mind when conducting its review, and therefore on the basis of the scant evidence before it cannot hold as a matter of law that in enacting and amending the Ordinance, the City Council drew reasonable inferences from substantial evidence. *See Shrink*, 528 U.S. at 402 ("Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments — at least where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge.")

In this case, Defendant is concededly unable to adduce "studies, reports, or other evidence demonstrating that entities making exclusively independent expenditures in connection with San Diego city elections pose a danger of actual or apparent corruption in receiving contributions, or in making independent expenditures, in relation to San Diego city elections." (Joint Statement at 3.) This by itself is insufficient to show that the Ordinance fails to withstand scrutiny under the "closely drawn" standard, however, which would support a grant of summary judgment for Plaintiff. Defendant cites

1 the detailed reasoning in *McConnell* in support of its motion, and in opposition to Plaintiff's motion.
2 The Court recognizes the reasonable possibility that Defendant relied in part on *McConnell*, *Lincoln*
3 *Club of Orange County*, and other recent precedents in determining how to amend the Ordinance. The
4 Court also recognizes that the City Council may have relied on media reports of large contributions
5 and scandals (as contrasted with studies or other more formal evidence). The court in *Shrink*, 528 U.S.
6 at 393, and *Montana Right to Life Ass'n*, 343 F.3d at 1092, relied in part on these less formal types of
7 evidence in the legislative record. Furthermore, *Shrink* specifically permits cities to rely on more
8 loosely-fitting evidence. 528 U.S. at 394 n.6 ("The First Amendment does not require a city, before
9 enacting . . . an ordinance, to conduct new studies or produce evidence independent of that already
10 generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to
11 be relevant to the problem that the city addresses") (quoting *Renton v. Playtime Theatres, Inc.*, 475
12 U.S. 41, 51–52 (1986)).

13       Plaintiff has lodged a 14-volume legislative record with the Court, which the Court assumes
14 is likely to provide examples of the City Council's reasoning in enacting the Ordinance, and any
15 reports or information the Council relied on. The parties agree that this represents the available
16 legislative record. (Joint Statement at 3.) Plaintiff contends this was produced on the day its motion
17 for summary judgment was due, and that it therefore did not have the opportunity to conduct a full
18 review of the record at that time. (Pl.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. at 8.) As part
19 of the same lodgment, Plaintiff lodged full transcripts of three separate City Council hearings. The
20 parties have not cited specific portions of these documents. The parties have also submitted
21 declarations and evidence, but most of these appear to be submitted for other purposes, such as
22 showing the level of independent expenditures in municipal elections and showing Lincoln Club's ties
23 to the Republican party.

24       Two items have been submitted, however, that do support each of the parties' positions.
25 Plaintiff submitted a Supplementary Declaration by Mark Austin stating that Mr. Austin had reviewed
26 the record and found no evidence that the City Council in enacting the Ordinance had based its
27 decision on concerns for corruption or the appearance thereof. (Austin Suppl. Decl., filed March 23,
28 / / /

2006, at 2–3.) This was submitted around the time Plaintiff filed its opposition. The delay appears to be attributable to the late production, as noted previously.

Defendant's reply, filed April 3, 2006, represented its sole opportunity to respond to the Austin declaration. Along with its reply, Defendant submitted a declaration by Donald Shanahan, identifying a search for media articles during the City of San Diego's last election cycle conducted by a paralegal in Mr. Shanahan's office. The results are attached as Ex. G to the declaration. In its reply, Defendant refers to Ex. G, arguing that articles showing large donations by out-of-town donors support a finding of an appearance of corruption.

The Austin declaration and Ex. G represent attempts to point to evidence that the City Council did (or did not) draw reasonable inferences from substantial evidence to determine that corruption or the appearance of corruption was a problem in San Diego. However, the Court cannot accept either of them as conclusive. To begin with, both were submitted late, along with the parties' replies, and therefore the opposing party did not have full opportunity to respond. With regard to the Austin declaration, the Court is mindful that the evaluator is Plaintiff's representative and that in his declaration, he evaluated the evidence and reached legal conclusions. Defendant's Ex. G represents a compilation of articles outside the legislative record. While it is reasonably possible the City Council saw and considered these articles, or some of them, there is no clear evidence of this. Finally, if the Court accepts these as evidence, it serves to show that there is a genuine issue of material fact.

As to the question of the Constitutionality of § 27.2936, the Court therefore holds that neither party has met its initial burden of showing there is no genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324.

In the interests of fairness and practicality, the Court will not search through the record and piece together either party's argument on this issue. Because neither party has fully briefed the issue of evidence in the legislative record, including the City Council's reasoning in enacting and amending the Ordinance, the Court will not reach the Constitutionality of § 27.2936 at this time. Bearing in mind that the Court's review of this statute could result in a declaration that the Ordinance is Constitutionally infirm, the Court will decide the issue only after briefing and trial. *See Ass'n of Mexican-American Educators v. State of Cal.*, 231 F.3d 572, 600 (9th Cir. 2000) (citing "the

well-established principle of judicial restraint that courts should avoid declaring a statute unconstitutionally void when possible").

### D. Constitutionality of § 27.2950

Plaintiff challenges this section of the Ordinance because it prevents Plaintiff's organizational members' dues from being used for any independent expenditures. Plaintiff does not base any of its argument on the status or structure of any of its organizational members, nor is evidence of any its organizational members' status or associational structure before the Court. *See NCPAC*, 470 U.S. at 496 (holding that because a statute restricted electioneering activities of small, unincorporated associations as well as large corporations, it was subject to strict scrutiny). Rather, Plaintiff's argument is simply that this provision is under-inclusive on its face and therefore unconstitutional.

Section 27.2950 provides, in pertinent part:

Prohibitions and Limits on Contributions From Organizations

. . .

(g) It is unlawful for a general purpose recipient committee to attribute a contribution to a person other than an individual for the purpose of supporting or opposing one or more candidates for elective City office.

(h) This section shall not be construed to prevent a general purpose recipient committee from accepting a contribution from any person for any purpose, but shall be construed to limit the source of contributions a general purpose recipient committee may use to participate in City candidate elections.

San Diego Mun. Code § 27.2950.

The heart of Plaintiff's argument is that this provision is fatally under-inclusive because nothing in ECCO prevents a corporation or any other organizational entity from making unlimited independent expenditures directly, out of its own general treasury. Under § 27.2950(a)–(c), organizations are prohibited from making direct contributions to candidates for city office, or to the candidates' controlled committee.

An under-inclusive regulation imposes limits on some speech in pursuit of a sufficiently important government interest while "leaving appreciable damage to that supposedly vital interest unprohibited." *Florida Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and concurring in the judgment). Showing that a regulation is under-inclusive is one way to demonstrate

that the regulation does not satisfy either strict scrutiny or the more lenient "closely drawn" standard. *See Bellotti*, 435 U.S. at 786, 792–93 (when applying "closely drawn" standard, holding statute belied its asserted purpose because it was both over-inclusive and under-inclusive).

In this case, however, the Court does not accept that omitting to prohibit independent expenditures by the organizational members themselves constitutes under-inclusiveness. Independent expenditures, whether by an individual, an association, or a business entity, are expenditures, not contributions, and are therefore subject to less regulation under well-established precedent. *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 259–60 (1986) ("restrictions on contributions require less compelling justification than restrictions on independent spending"); *NCPAC*, 470 U.S. at 494–95 (distinguishing *CMA*, which upheld limits on contributions to organizations that made independent expenditures, from the case before it, where limits on independent expenditures by organizations were struck down).

This is a reasonable distinction, particularly in light of *McConnell*'s in-depth discussion of the evidence of corruption. 540 U.S. at 144–52 (discussing evidence that buying influence with politicians through donations to parties and more loosely-associated organizations is widespread).

Even regulations impinging on First Amendment rights are not required to be completely comprehensive. In the this context, the Supreme Court has explained:

> In deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.

*Buckley*, 424 U.S. at 105 (citations, internal quotation marks, and alteration omitted).

While donations through organizations might buy influence — or be perceived as doing so — indirect, independent expenditures are less likely to do so. *See Buckley*, 424 U.S. at 47 (opining that the danger of corruption lessened as the candidate's control over the contribution decreased); *Colorado I*, 518 U.S. at 617 (discussing the decreased risk of indirect support). If a business expends its own money in order to undertake independent, non-coordinated campaigning, there is no intermediary organization to report the donation to the candidate or party, and therefore less danger

that the candidate will feel obligated to provide the donor with increased access or influence. *See McConnell*, 540 U.S. at 147 (describing political organizations' recording of donations and distribution of donor lists). It is less plausible that a business or other organization could gain influence by self-reporting its own independent electioneering activities.

For these reasons, the Court holds that § 27.2950 is not unconstitutionally under-inclusive so as to prevent it from satisfying "closely drawn" scrutiny. Defendant's motion for summary judgment is therefore **GRANTED** as to this issue, and Plaintiff's motion for partial summary judgment on this issue is **DENIED**.

## IV. CONCLUSION AND ORDER

The cross-motions for summary judgment or partial summary judgment are therefore **DENIED**. At trial, the parties will be expected to present evidence to show whether the City Council drew reasonable conclusions from substantial evidence in enacting the Ordinance.

Plaintiff has sought damages, declaratory and injunctive relief, attorney's fees and costs, and any other relief as the Court deems just and proper. Plaintiff has demanded jury trial of the issues. So that the Court may determine whether jury trial of the issues is warranted, the Court orders the parties to submit briefs, not to exceed ten pages in length, not counting appended or lodged material, on the issue of the availability of damages. The parties are ordered to serve and file these no later than **twenty-eight days following the file stamp date on this order**. No later than fourteen days following the deadline for submitting these briefs, the parties may, if they wish, submit reply briefs, not to exceed five pages in length, not counting appended or lodged material. Following submission of these documents, the parties will await further order of the Court.

**IT IS SO ORDERED.**

DATED: 9-22-06

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

cc: MAGISTRATE JUDGE JAN M. ADLER
ALL COUNSEL OF RECORD